IN THE UNTIED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff, | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 12-239-1 |
| | : | |
| FRANK MCALEESE,<br>    Defendant. | : | |

**Goldberg, J.**                                                                                                               July 10, 2013

## Memorandum Opinion

Defendant, Frank McAleese, is charged with firearms offenses related to several firearms purchases and sales at Lock's Philadelphia Gun Exchange ("Lock's").[1] The government asserts that McAleese used identification issued in a different name, and falsely certified on firearms purchase forms that he had never been convicted of a felony. (See Indictment, Doc. No. 1.)

McAleese has moved to suppress records of these purchases maintained by Lock's, as well as in-court identification testimony by certain of Lock's employees, arguing that such evidence is fruit of an illegal search of a cellular telephone found in his vehicle. For the following reasons, Defendant's motion will be granted, and the evidence suppressed.

**I.    Factual and Procedural Background**

The firearms charges stem from an investigation by the New Jersey State Police into the death of McAleese's girlfriend, Carole Brown. As part of their investigation, the State Police

---

[1] Specifically, McAleese has been charged with three counts of making false statements for the purpose of obtaining a firearm in violation of 18 U.S.C. §§ 922(a)(6), 924(a)(2), three counts of making false statements on a federal firearms application in violation of 18 U.S.C. § 924(a)(1)(A), and four counts of unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

obtained a warrant and searched McAleese's vehicle, a Ford Taurus. Inside the Ford, the officers recovered a cellular phone which was subsequently searched pursuant to a separate warrant. As part of the cell phone search, the State Police investigated the owner of every phone number stored as a contact in the phone's memory. One of these phone numbers belonged to Lock's, and the police eventually visited that store and obtained the transaction records and developed the identification witnesses at issue. In arguing that this evidence should be suppressed, McAleese has challenged the legality of both the search of his car which led to the seizure of his cellular phone, and the search of his phone's memory which led the police to Lock's.

The first search challenged by McAleese—the search of his Ford Taurus—was conducted pursuant to a warrant issued on November 10, 2011. (Nov. 10, 2011 Warrant, 1/24/13 Hrng. Ex. 7.) The affidavit supporting the warrant, sworn to by Detective Sergeant Francis McGovern, establishes the following facts.

At 11:15 p.m., police were called to the Salem County Hospital after McAleese brought Carole Brown to the Emergency Room in her 2006 Hyundai Tucson.[2] Brown had severe blunt force trauma to the back of her head, and was pronounced dead at 11:25p.m. The State Police spoke with McAleese, who was covered in blood and appeared to be heavily intoxicated. McAleese told police that Brown was his girlfriend, and that the two had been together at her apartment earlier that night. According to McAleese, Brown had driven her car (the Hyundai Tucson) to the "Corner Bar" to purchase narcotics, and when she did not return after an hour, he walked to the bar, found her unconscious in the passenger seat and drove her to the hospital.

---

[2] Throughout the warrants at issue, Defendant is identified as "Maclaine" rather than "McAleese." (See Nov. 10, 2011 Warrant; Nov. 15, 2011 Warrant, 1/24/13 Hrng. Ex. 8.) It is undisputed that Defendant is the individual referred to in the warrants, and, for uniformity, we refer to him as McAleese throughout this opinion.

2

Through the window of the Hyundai, police observed significant evidence of an assault, including pools of blood and blood spatter, as well as brain and bone fragments.

The police next visited Brown's home, where McAleese's 2005 Ford Taurus was parked "haphazardly" in a parking spot in front of Brown's apartment. One of Brown's neighbors told the police that shortly before 10:15 p.m. she heard Brown arguing near the rear of Brown's Hyundai with someone she assumed was McAleese. According to the neighbor, a few minutes later she looked out the window and Brown's Hyundai was gone, while McAleese's Ford Taurus remained.

Sergeant McGovern telephoned Brown's ex-husband, George Brown, who explained that he and Carole Brown had been divorced for approximately twenty-five years, and spoke only occasionally. He was aware that Carole Brown had been dating McAleese intermittently for nearly twenty years.

Based on this information, on November 10, 2011, warrants were issued authorizing the search of both Brown's Hyundai Tucson and McAleese's Ford Taurus for any items that might be considered evidence of murder or drug possession. Inside the Ford, a Samsung "Cricket" cellular phone was found, which is the subject of the second search challenged by McAleese.

The search of the Cricket was executed pursuant to a warrant issued on November 15, 2011. The warrant sought permission to search "all information stored in the telephone." The supporting affidavit, sworn to by Detective Dennis Quinn, also of the New Jersey State Police, reiterated the facts that formed the basis of the November 10, 2011 warrant, which are detailed above. The only additional facts were contained in the final paragraph:

> When Frank [McAleese] was placed under arrest, he was found to possess the aforementioned Samsung "Jitterbug" cellular telephone (MODEL SPT-A310, Bearing Serial Number 268435458905807471). During the execution of the search

> warrant <u>on the vehicle whereupon the crime was committed (2006 Hyundai Tucson</u>, bearing New Jersey Registration YHH13B, and Vehicle identification Number KM8JM 12B86 U2528 78), a Samsung "Cricket" Cellular Telephone, Model SCH-R211, bearing serial number 268435459000212693 was located therein.

(Nov. 15, 2011 Warrant, 1/24/13 Hrng. Ex. 7, § 5, ¶ H (emphasis added).)

The government concedes, as they must, that the facts in the affidavit indicating that the Cricket was found in the vehicle where "the crime was committed" were false. In fact, the Cricket had not been recovered from the Hyundai, where significant evidence of a homicide was found, but rather from McAleese's Ford Taurus, which had been parked in front of Brown's house. Detective Quinn acknowledged this mistake during the suppression hearing, confirmed that the affidavit contained false information and characterized the incorrect location of the Cricket as a "typo." (Nov. 15, 2011 Warrant; N.T. 1/24/13, pp. 35-36.)

Based upon the facts attested to by Detective Quinn, a warrant was approved by a New Jersey Supreme Court Judge that authorized the search of "[a]ll information stored in the telephone," and the seizure of evidence "tending to establish the commission of the crimes of" murder, possession of a weapon, possession of a controlled substance or possession of drug paraphernalia. (Nov. 15, 2011 Warrant, pp. 1-2.)

After the Cricket was recovered, it was searched by Detective McDermott, who navigated through the phone and manually recorded all of the data saved on it, including outgoing calls, incoming and missed calls, text messages and stored contacts. (N.T. 1/24/13, p. 98.) After recording the contacts stored in the phone, McDermott began to investigate the identity of those contacts. Among others, a contact was stored in the phone with the name "Lock's" along with a phone number with a "215" area code. McDermott was able to ascertain that this phone number belonged to Lock's Philadelphia Gun Exchange. (<u>Id.</u>, pp. 97-99.)

McDermott visited Lock's roughly four months later, in March 2012, as part of a "general canvas" for information relating to McAleese. There, he approached several of Lock's employees with a picture of McAleese to inquire if they recognized him. Exactly what occurred in the subsequent exchange between McDermott and the employees at Lock's is the subject of significant dispute, but both the government and McAleese agree that McDermott's visit resulted in the recovery of records that reflect three gun transactions between Lock's and McAleese in 2008. Additionally, during McDermott's initial visit, and subsequent visits by both McDermott and Special Agent Sarah Jane Serafino of the Bureau of Alcohol Tobacco and Firearms ("ATF"), four of Lock's employees identified McAleese as an individual who had purchased and sold firearms at Lock's in the past.

The government intends to introduce the records recovered from Lock's at trial, and to call Lock's employees to testify that they recognize McAleese as an individual who previously purchased and sold firearms at the store on multiple occasions. McAleese urges that this evidence is inadmissible because it is fruit of an illegal search in that the search of his Ford Taurus, which led to seizure of the Cricket cell phone, was conducted without probable cause. He also asserts that the warrant to search the Cricket was issued based upon a materially false affidavit. McAleese claims that had the government not conducted these illegal searches, they would not have gone to Lock's, and thus, the records and witnesses obtained as a result must be suppressed as fruit of the illegal searches.

The government offers several arguments against suppression of this evidence. First, it asserts that the search of McAleese's Ford Taurus was supported by probable cause, or at least conducted in good faith reliance upon a warrant. Regarding the search of the Cricket found inside of the Ford, the government acknowledges that the affidavit supporting this search

5

contains false information. However, the government asserts that suppression is unwarranted because the misstatement was not made knowingly or recklessly, and the affidavit establishes probable cause even when the falsity is corrected. Finally, the government urges that even if McAleese can establish a Fourth Amendment violation, the evidence he is seeking to exclude is not sufficiently linked to the violation to justify suppression.

## II. Legal Standards

The Fourth Amendment to the United States Constitution provides that,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

Normally, a search is reasonable only when "effectuated with a warrant based on probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002). Probable cause exists if, considering the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). A judicial determination of probable cause is given "great deference," and a reviewing court is to uphold the warrant as long as there is a "substantial basis" for concluding that probable cause existed. United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000) (quoting Gates, 463 U.S. at 238). Additionally, review of the issuing judge's conclusion is based solely on "the facts that were before the [judge], i.e., the affidavit." United States v. Mikevich, 638 F.3d 178, 182 (3d Cir. 2011) (quoting United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993)). It is the defendant's burden, as the proponent of the motion to suppress, to establish that

his Fourth Amendment rights were violated. United States v. Acosta, 965 F.2d 1248, 1257 (3d Cir. 1992).

Even if a reviewing court concludes that the issuing judge did not have a substantial basis for finding probable cause, the evidence will not be suppressed if the officers conducting the search relied on the warrant in good faith. United States v. Pavulak, 700 F.3d 651, 663 (3d Cir. 2012). Under this rule, suppression is not appropriate where "officers act in the 'reasonable belief that their conduct does not violate the Fourth Amendment.'" Id. (quoting United States v. Leon, 468 U.S. 897, 918 (1984)). Often, the existence of a warrant alone "suffices to prove that an officer conducted a search in good faith." United States v. Hodge, 246 F.3d 301, 307-08 (3d Cir. 2001). Nonetheless, there are four "rare circumstances" where "although a neutral [judicial officer] has found probable cause to search, a lay officer executing the warrant could not reasonably believe that the [judge] was correct." United States v. Stearn, 597 F.3d 540, 561 (3d Cir. 2001). An officer's reliance upon a warrant will not prevent suppression when:

1. The judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

2. The judge abandoned his judicial role and failed to perform his neutral and detached function;

3. The warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

4. The warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized

Pavulak, 700 F.3d at 664 (quoting Stearn, 597 F.3d at n. 19).

McAleese asserts that the affidavit supporting the search of his Ford Taurus was "so lacking in indicia of probable cause" that there could be no good faith reliance by the police. Additionally, he argues that the warrant for the search of the Cricket was based upon an affidavit

7

that was deliberately or recklessly false in that it misidentified the vehicle in which the phone was found. This latter argument implicates a rule announced by the United States Supreme Court in Franks v. Delaware, 438 U.S. 154 (1978). Pursuant to Franks, where the defendant establishes that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit . . . and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Franks, 438 U.S. at 156.

### III. Discussion

#### A. The Search of McAleese's Ford Taurus

McAleese first argues that the search of his Ford, which led to the recovery of the Cricket cell phone, was not supported by probable cause and violated his rights under the Fourth Amendment.[3] McAleese urges that the mere presence of this vehicle outside of Brown's apartment is insufficient to establish a "fair probability" that evidence related to her death would be found inside the vehicle.

The government disagrees, and notes that information received from Brown's neighbor, which indicated that Brown and McAleese were arguing outside of the apartment shortly before her death, supported the reasonable inference that Brown may have been assaulted outside of her apartment and in close proximity to McAleese's car. As such, and in light of other circumstances that provided probable cause to believe that McAleese attacked Brown, the

---

[3] McAleese argues separately that the police seized his Ford and transported it to an impoundment lot prior to the issuance of a warrant and without justification. (Doc. No. 27, pp. 8-13.) We need not address this argument in light of our conclusion that the evidence must be excluded for other reasons. Nonetheless, we note that the seizure and search of a vehicle, even if not conducted pursuant to a warrant, is permitted under the Fourth Amendment as long as it is supported by probable cause. See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996).

government contends that there was a fair probability that evidence of Brown's death, including the murder weapon, would be found in McAleese's Ford.[4]

The government's arguments on this point are not overly persuasive. A careful reading of the affidavit reflects that Brown's neighbor stated only that she heard Brown "talking loud" with someone who she "assumed" to be McAleese. A few minutes later, the neighbor said she looked out the window and saw that Brown's vehicle (the Hyundai) was gone and McAleese's vehicle (the Ford) remained. (Nov. 10, 2011 Warrant, § 5, ¶ E.) Nothing about these statements connect the Ford to any violent altercation between McAleese and Brown. Nor do these statements tend to suggest that Brown was assaulted near either her apartment or the Ford. In fact, because the inside of the Hyundai was permeated with blood while no physical evidence of assault was found on or near the Ford, the evidence contained in the affidavit clearly suggests that Brown was assaulted inside of the Hyundai. The fact that McAleese brought Brown to the hospital an hour after Brown's neighbor noticed that the Hyundai was no longer parked in front of Brown's apartment also raises questions as to whether there was a fair probability that evidence regarding Brown's death would be found in the Ford Taurus.

Having expressed these concerns, we are nonetheless reluctant to find that these gaps provide sufficient justification for overturning the issuing judge's finding of probable cause. We do not make the probable cause determination de novo, but must be deferential to the issuing judge's conclusion that there was a fair probability that evidence of Brown's death would be

---

[4] We note that the warrant also authorized the police to search for "evidence tending to establish" possession of a controlled substance or paraphernalia. (Nov. 10, 2011 Warrant, § 1.) The government has not focused its argument on this issue. The affidavit does not contain any facts linking McAleese to illegal narcotics. Indeed, the only hint of drug use is that McAleese was "extremely intoxicated" when he was taken into custody. (Nov. 10, 2011 Warrant, § 5, ¶ G.) There are many legal methods of intoxication, and we do not see any basis to conclude that probable cause existed to search McAleese's vehicle for evidence related to illegal narcotics. This defect is immaterial because, as explained infra, the affidavit provided a substantial basis to believe evidence related to Brown's death would be found in the vehicle.

found in McAleese's vehicle. We may only overturn this finding if it was without a "substantial basis." United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000) (quoting Gates, 463 U.S. at 238).

Applying this deference, we note that the affidavit does establish that: (1) McAleese's Ford was parked in a "haphazard" manner outside of Brown's apartment; (2) approximately an hour before Brown arrived at the hospital she had been arguing near the rear of the Ford with someone who, based upon the surrounding circumstances, could reasonably be inferred to be McAleese; and (3) Brown's skull had been crushed before she was brought to the hospital by McAleese, who was covered in blood spatter when they arrived.

Although this is a close call, in light of these facts, we cannot conclude that the issuing judge's finding that evidence related to Brown's death, including perhaps the murder weapon would be found in McAleese's vehicle, was without substantial basis.[5]

### B. The Search of the Cellular Telephone's Memory

Given our conclusion that the search of McAleese's vehicle was legal, we must next consider McAleese's argument that the search of his Cricket cell phone violated his Fourth Amendment rights. As with the search of the Ford Taurus, McAleese argues that the search of his phone was unsupported by probable cause. Unlike our review of the search of the Ford, we must now also consider that a false statement was included in the affidavit of probable cause reviewed and approved by the issuing judge.

---

[5] The same reasons underlying our conclusion that there was a substantial basis for the issuing judge's finding of probable cause, defeat McAleese's argument that the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Stearn, 597 F.3d at n. 19. Accordingly, even if we concluded the search violated McAleese's Fourth Amendment rights, the officers' good faith reliance on the warrant would make exclusion of the evidence unwarranted. Id.

The falsity at issue is significant and concerns the vehicle in which the Cricket cell phone was found. As noted previously, in the affidavit to support probable cause Detective Quinn stated that the Cricket was recovered from Brown's Hyundai. This fact was false. The phone was found inside of McAleese's Ford Taurus during the search of that vehicle. Indeed, the evidence ledgers confirm that the Cricket was located in McAleese's Ford, and the government does not contend otherwise. (N.T. 1/24/13, p. 35.)

The inclusion of false information in an affidavit does not necessarily render a warrant based upon that affidavit invalid. Rather, to exclude the fruits of the search, a defendant must also show that the falsity included in the affidavit was (1) made deliberately or with reckless disregard for its truth, and (2) "material," i.e., that "the false statement or omitted facts are 'necessary to the finding of probable cause.'" United States v. Pavulak, 700 F.3d 651, 665 (3d Cir. 2012) (quoting United States v. Yusuf, 461 F.3d 374, 383-84 (3d Cir. 2006)).

McAleese urges that Detective Quinn was plainly aware that the Cricket was found in McAleese's Ford, but nonetheless stated in his affidavit that it was found in Brown's Hyundai. In addition to Quinn's admission that he reviewed the evidence log, which clearly noted that the phone was located in the Hyundai, an earlier section of Quinn's affidavit references the search of the Ford, further showing that Quinn was aware of the search of the Ford where the Cricket cell phone was actually found. (Nov. 15, 2011 Warrant, § 5, ¶ E.) Indeed, according to the affidavit, Detective Quinn was the first officer to visit Brown's apartment and noted the presence of McAleese's Ford. (Id., ¶¶ D-E.)

The government does not contest any of these facts, but argues that they fail to show Quinn's false statement to be anything more than an innocent mistake. The government urges that there is no evidence reflecting that Quinn intentionally lied in the affidavit, or that the falsity

11

was included with the purpose of misleading the issuing judge. The government notes that Quinn described the falsity as a "typo," and theorizes that he was unaware that he had made the error until he was asked about it at the hearing.[6]

A defendant need not show that the false fact was included in the affidavit intentionally, with the specific purpose of misleading the judge into approving the warrant. Franks, 438 U.S. at 165 (facts in affidavit must "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true."); see also Lombardi v. City of El Cajon, 117 F.3d 1117, 1123 (9th Cir. 1997) ("We disagree that intent to mislead the issuing court is an element of" a Franks claim.). Rather, a defendant need only show that the affiant either knew the fact was false or "ha[d] obvious reasons to doubt the truth of what he or she [was] asserting." Yusuf, 461 F.3d at 384 (quoting Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000)).

Although we do not find that Quinn included the false information with the malicious purpose of deceiving the issuing judge, given the facts at his disposal at the time he prepared the affidavit, we are left with no other choice than to conclude that he at least had "obvious reasons to doubt the truth of what he was asserting." Wilson, 212 F.3d at 788. The evidence available to Quinn when he prepared the affidavit unequivocally reflected that the Cricket cell phone was found inside McAleese's vehicle, the Ford Taurus. This vehicle was searched prior to the Hyundai, and Quinn acknowledged that the evidence ledger from the search of the Ford indicated that the Cricket was found in that vehicle. Thus, there was no basis for Detective Quinn to believe the statement he swore to in his affidavit was true, and every reason for him to

---

[6] Detective Quinn never testified as to when he became aware of his error, and did not state that he first learned of his mistake at the suppression hearing. (See N.T. 1/24/13, pp. 25-38.) The government's assumption on this point is based solely on Detective Quinn's demeanor when he was confronted with his misstatement by defense counsel. While we view the government's argument on this point as reasonable, we were unable to draw any definitive conclusion on this issue from Quinn's demeanor.

12

know that it was false. It is not McAleese's burden to prove that Detective Quinn made this false statement for a malicious purpose, but only to show that Detective Quinn knew it was false at the time it was included in his affidavit.

We also take issue with the government's attempt to minimize the false information by characterizing it as a "typo." A "typo" is an error in the typing process, and normally involves a small and perhaps insignificant detail. In contrast, the mistake at issue here concerned significant portions of paragraph "H" of the affidavit. It is worth repeating that this paragraph was particularly important as it described the location where the item to be searched had originally been recovered. The false information not only involved the wrong location, but also included inaccurate vehicle registration information and the wrong vehicle identification number. This mistake created a situation where the reviewing judge, in considering whether probable cause existed to search a cell phone, was incorrectly advised that the phone was found in the same vehicle that contained pools of blood, brain and bone fragments, and was owned by the deceased. In fact, the truth was that the cell phone was actually found in an entirely different vehicle that contained no evidence of an assault, and which was parked some distance from the bar Brown was purportedly driving to.

Having concluded that Detective Quinn's affidavit contained a false statement that was made with reckless disregard for its veracity, we must next consider whether that fact was "material." In this context, a fact is material if it is "necessary to the finding of probable cause." United States v. Rivera, 347 Fed. Appx. 833, 839 (3d Cir. 2009). To prevail, the defendant must "demonstrate that, with the false material corrected, the affidavit's content is insufficient to establish probable cause." Id. (citing Franks, 438 U.S. at 155-56).

Applying the materiality standard to this case, McAleese must show that the affidavit, when corrected to reflect that the Cricket was found in his Ford Taurus rather than Brown's Hyundai, fails to establish probable cause to search the phone's entire memory and stored contacts. McAleese argues that this fact is material, and we agree. Again, the distinction between the vehicles and their relationship to the crime is indisputably substantial. Brown was driven to the hospital in the Hyundai, and the interior of the car was permeated with blood and other evidence of a brutal assault. This vehicle, and the evidence found inside, are intimately related to the circumstances of Brown's death. A cellular phone found inside the Hyundai could reasonably be expected to have evidence relating to what preceded her assault. McAleese's Ford, on the other hand, was parked at Brown's apartment and did not contain any evidence suggesting that it was related to Brown's death. There are no facts contained in the affidavit suggesting that a cellular phone inside of McAleese's Ford, and the contact information contained therein, would contain similar evidence.[7]

In fact, the government offers no explanation as to what evidence could reasonably be expected to be found in the memory of a cellular phone recovered from McAleese's car. When pressed at oral argument on this issue, the government asserted that it was reasonable to infer that evidence of McAleese's relationship with Brown, or conversations McAleese had with

---

[7] We note that the government also argues that, even if the affidavit contained no information whatsoever regarding where the cellular phone was found, "the warrant remains valid because the seizure of the phone pursuant to a warrant in the murder investigation gives probable cause to search it to establish its number, contact information, and the like." (Gov.'t Supp. Br., Doc. No. 28, p. 15.) The government offers no legal authority for its blanket assertion that any time a cellular phone is recovered during a murder investigation, regardless of where it is found, there is probable cause to search the entire memory of the phone. We decline to accept such a blanket rule, which contradicts the fundamental principle that probable cause is a fact-specific inquiry based upon the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 232 (1983) ("probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.").

either Brown or any supposed drug dealer on the night of Brown's death, would likely be found on the phone. (N.T. 4/9/13, pp. 35-36.) Even accepting that as true, this argument fails to justify the broad scope of the search conducted by the police. United States v. Christine, 687 F.2d 749, 753-54 (3d Cir. 1982) (quoting 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 4.6 at 97 (1978)) ("An otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based."). The government's reasoning, if accepted, would perhaps justify a warrant authorizing a search of the call history of the cellular phone, or a history of its text messages. However, the search conducted by the police went much further, and included a complete inventory of all the data contained on the cellular phone, including every contact stored in its memory. The government has not explained how, with the false material set to one side, the corrected affidavit provides probable cause for a search of the contacts stored on the phone's memory, which ultimately led the police to Lock's. See id. (the district court should measure "the scope of the search and seizure authorized by the warrant against the ambit of probable cause established by the affidavit upon which the warrant issued.").[8]

---

[8] The need to tailor the scope of the search to the "ambit of probable cause" in the affidavit is particularly pressing in the context of the search of a cell phone, which "is quite likely to contain, or provide ready access to a vast body of personal data." United States v. Flores-Lopez, 670 F.3d 803, 805 (7th Cir. 2012). Modern cell phones have the ability to send text messages, take pictures, access the Internet and save a user's browsing history, store financial data, voicemails and audio or video recordings, and even remotely access home surveillance cameras. See id., at 806. These devices give the user access to large stores of "personal and sensitive information touching on many aspects of private life," and therefore create a "far greater potential 'for the 'intermingling' of documents and a consequent invasion of privacy.'" United States v. Lucas, 640 F.3d 168, 178 (6th Cir. 2011) (quoting United States v. Walser, 275 F.3d 981, 986 (10th Cir. 2001)). It is important that the search of a cell phone be tailored to prevent a "sweeping, comprehensive search" of the phone's data. Walser, 275 F.3d at 986.

15

We therefore conclude that the falsity contained in the affidavit is material, and the corrected affidavit fails to establish probable cause to search the stored memory of the Cricket cell phone. As such, McAleese has met all of the elements for a successful Franks challenge, and the fruits of the search of the memory of the Cricket cell phone must be suppressed.[9]

### C. Fruits of the Illegal Search

"The exclusionary rule . . . prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" Murray v. United States, 487 U.S. 533, 536-37 (1988) (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)). Accordingly, application of the exclusionary rule requires us to consider whether the evidence challenged by McAleese "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id., at 488.

McAleese argues that the connection between the unlawful search of his cell phone and the evidence obtained at Lock's is demonstrated by Detective McDermott's testimony. McDermott stated that his "visit to Lock's Gun Exchange came about after" his search of McAleese's cell phone, that the "only reason" he visited Lock's was because the store's phone number was recovered from McAleese's phone, and that "no other piece of evidence . . . indicated anything about the Lock's gun shop." (N.T. 1/24/13, pp. 97, 104.) We agree with

---

[9] The government's final argument on this issue is that even if the search is invalid, the fruits should not be excluded because the officers conducted the search in good faith reliance upon a warrant. However, this argument is premised upon an assertion that the Court has already rejected—that the warrant does not contain a deliberate or reckless falsehood. It is well-established that there can be no good faith reliance on a warrant under such circumstances. United States v. Williams, 3 F.3d 69, 74 n. 4 (3d Cir. 1993) (good faith is inapplicable where "the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit.").

16

McAleese that Detective McDermott's testimony establishes a direct link between the unlawful search of McAleese's phone and the evidence obtained at Lock's.

Even where such a link exists, however, the independent source, inevitable discovery, and attenuation doctrines may apply to permit admission of the later-discovered evidence. United States v. Pelullo, 173 F.3d 131, 136 (3d Cir. 1999). Here, the government argues that the connection between the search of McAleese's cell phone and the evidence obtained at Lock's is too attenuated to justify suppression. We disagree.

The government offers three reasons as to why the sales records recovered at Lock's should not be suppressed: (1) they "were maintained before the . . . putative illegality"; (2) "McAleese may not suppress his identity"; and (3) McAleese does not have a "privacy interest" in the records maintained by a third party. (Gov't Supp. Br., Doc. No. 34, pp. 7-8.)

While an illegal search does not "reach backward to taint information that was in official hands prior to any illegality," United States v. Crews, 445 U.S. 463, 475 (1980) (emphasis added), that rule does not prevent the suppression of evidence that was merely in existence prior to an illegal search. Rather, Crews applies to prevent the suppression of evidence that the government both was aware of and possessed prior to the search. This rule is a particular application of the more general requirement that there must be a link between the illegal search and the government's discovery of the evidence—no such link exists where the government's discovery of the evidence preceded the search. Here, while the records may have existed prior the unlawful search, they were in Lock's possession and not the government's.

The government also argues that the sales records are "identification" evidence that may not be suppressed. The government correctly notes that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an

17

unlawful [search]." I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1040 (1984). However, that rule is inapplicable to the evidence at issue. The transaction records recovered from Lock's do not demonstrate McAleese's identity. Rather, they are offered by the government to show that he engaged in specific conduct—i.e., providing false information during prohibited firearms transactions. As the records are evidence of specific transactions, they do not fall within the line of identity cases cited by the government.

The government's final argument concerning the transaction records is that McAleese lacks standing to suppress these records because he had no reasonable expectation of privacy in the records or in Lock's gun shop. This argument fails because the standing requirement applies to the place where the search occurred, not to the place where the derivative evidence was recovered. United States v. Stearns, 597 F.3d 540, 551 (3d Cir. 2010) (The proponent of a motion to suppress must show "that he had a legitimate expectation of privacy in the place searched." (internal quotation and corrections omitted)). Here, the "place searched" was a cellular phone that belonged to McAleese and was recovered from inside his vehicle. McAleese plainly had a reasonable expectation of privacy in this location, and the government does not argue otherwise. McAleese need not make an additional showing that he had a reasonable expectation of privacy at Lock's because he does not argue that any of the government's conduct there violated his Fourth Amendment rights. Rather, he argues that the evidence recovered there is tainted by the earlier search of his cellular phone.

Turning to the in-court identification testimony of Lock's employees, the government argues that this evidence is too attenuated to be considered fruit of the prior search because it is the product of these witnesses' independent recollections of transactions that McAleese conducted at Lock's. However, the fact that one aspect of an in-court identification has a source

independent from the unlawful search does not make it so attenuated that it can be considered untainted by the illegal activity. As the Supreme Court noted in Crews, "[a] victim's in-court identification of the accused has three distinct elements": (1) the witness' presence at trial; (2) the witness' "knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations"; and (3) the defendant's physical presence in the courtroom. 445 U.S. at 472. Only where "none of these three elements 'has been come at by exploitation' of the violation of the defendant's Fourth Amendment rights" is the in-court identification sufficiently attenuated from the violation. Id. (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)).

The fact that the witnesses' presence in the courtroom would be the product of a Fourth Amendment violation distinguishes the present case from Crews. In finding that the in-court testimony was permitted, the Crews Court noted that "[t]his is not a case in which the witness' identity was discovered or her cooperation secured only as a result of an unlawful search or arrest of the accused." Id., at 472. The facts before us, however, present that exact situation. The identity evidence was obtained as a direct result of the unlawful search. As Detective McDermott testified, had the police not searched the memory of McAleese's cell phone, they would not have ever known of Lock's, visited that location or spoken to the store's employees as part of their investigation. (N.T. 1/24/13, pp. 97, 104.) These witnesses were not known to the police prior to the unlawful search, and their cooperation would not have been secured without it. Were these employees permitted to testify, their presence in court would be directly attributable to a Fourth Amendment violation. Such testimony is therefore tainted and must be suppressed.

## IV. Conclusion

For the above reasons, we find that search of McAleese's Cricket cellular phone violated his Fourth Amendment rights in that it was conducted pursuant to a warrant based upon an affidavit containing a material falsehood made with reckless disregard for its veracity. Were it not for this illegal search, the police would never have visited Lock's or obtained the transaction records and identification testimony they seek to admit at trial. We find that this evidence is tainted by the unlawful search, and therefore grant the Defendant's motion to suppress.[10]

---

[10] In light of our conclusion that the evidence challenged by McAleese must be suppressed for the reasons stated herein, we need not address his other arguments in favor of suppression, including that the identification procedures used by the government were so suggestive that admission of in-court identifications testimony by Lock's employees would violate due process. See Perry v. New Hampshire, 132 S.Ct. 716, 723-24 (2012).